[No. A050709. First Dist., Div. Five. Jan. 6, 1992.]

WILLIAM C. LAUBE et al., Petitioners, v.
JAY R. STROH, as Director, etc., et al., Respondents.

[No. A052207. First Dist., Div. Five. Jan. 6, 1992.]

RICHARD DE LENA, Petitioner, v.
JAY R. STROH, as Director, etc., et al., Respondents.

COUNSEL

Smith, Polson & Elstead, Lawrence G. Smith and John Clifton Elstead for Petitioners in No. A050709.

Michael J. Mandel and Don T. Yamamoto for Petitioner in No. A052207.

M. Armon Cooper, Kathleen R. Tichenor and Jo-Linda Thompson as Amici Curiae on behalf of Petitioners.

Daniel E. Lungren, Attorney General, Jose R. Guerrero, Allan Yannow and Kim Settles, Deputy Attorneys General, for Respondents.

OPINION

HANING, J.—In these consolidated cases, petitioners are liquor licensees who suffered suspension or revocation of their liquor licenses because they allegedly "permitted" drug sales in their establishments. Neither licensee knew or had reason to know of the drug trafficking. In each case the Department of Alcoholic Beverage Control (Department) took action against petitioners' licenses on the basis of its interpretation of *McFaddin San Diego 1130, Inc.* v. *Stroh* (1989) 208 Cal.App.3d 1384 [257 Cal.Rptr. 8]. *McFaddin* held that a liquor licensee "permits" drug activity when he or she fails to take reasonable steps to prevent it, even when the licensee has no reason to believe such activity is occurring, and regardless of the nature of the establishment or its clientele. The Alcoholic Beverage Control Appeals Board (Board) agreed with the Department's application of *McFaddin* to petitioners and affirmed the Department's decision. We issued a writ of review and heard oral argument. We annul the decisions of the Department and the Board.

PROCEDURAL BACKGROUND

The Department initiated disciplinary action against petitioners on the ground that petitioners "permitted" drug transactions and thus the continuation of their licenses would be contrary to public welfare and morals. (Bus. & Prof. Code, § 24200, subd. (a).)[1] The Department's ultimate authority derives from article XX, section 22 of the California Constitution, which provides, in part, that "[t]he department shall have the power, in its discretion, to . . . suspend . . . any specific alcoholic beverages license if it shall

---

[1] Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals . . . ." The "good cause" requirement carries over into proceedings under section 24200, subdivision (a). (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra,* 208 Cal.App.3d at p. 1387, fn. 3.)

The Department's charges were heard before an administrative law judge (ALJ) who made findings of fact and conclusions of law, then imposed the disciplinary action on behalf of the Department. In each case the Board affirmed by adopting the findings and conclusions verbatim. The Department's decision, and by extension the Board's, is now reviewable by this court on a petition for review. (§ 23090.)

FACTS

The facts in each case are taken from the findings made by the ALJ. The factual findings are "conclusive and final and . . . not subject to review." (§ 23090.3.)

■ The factual discussion involves the element of the licensee's knowledge of illegal or improper activity on his or her premises; this knowledge may be either actual knowledge or constructive knowledge imputed to the licensee from the knowledge of his or her employees. (See *Fromberg* v. *Dept. Alcoholic Bev. Control* (1959) 169 Cal.App.2d 230, 233-234 [337 P.2d 123]; *Endo* v. *State Board of Equalization* (1956) 143 Cal.App.2d 395, 401-402 [300 P.2d 366].)

A. *Laube*

Petitioners William C. Laube, general partner, and Vernie L. Laube, Donald R. Gardner, Melvyn L. Manaster, and John D. Sweet, limited partners, do business as the Pleasanton Hotel. In April of 1983 they received an on-sale general eating place license from the Department. They have no prior record of disciplinary action.

The Pleasanton Hotel is "an upscale type hotel, bar and restaurant operation." "The Chief of Police of Pleasanton described [petitioners'] operation as 'clean' and 'orderly' and praised the cooperation [petitioners'] staff demonstrated regarding police efforts to 'keep the Pleasanton Hotel the exemplary establishment that it is in our community.' "

On the ground floor are the main dining room, a banquet room, and a cocktail lounge with a bar. The lounge and bar are separated from the dining

room by a hallway. The lounge contains about 20 tables, a stage and a small dance area. Half the tables accommodate four or five patrons, and half about three. On a busy night the lounge can hold 65 patrons; in addition to the seated crowd, customers often stand between the tables. On Fridays the entire lounge is served by only two waitresses, one handling fifteen tables and the other only five. A band starts playing at 9 p.m.

The drug transactions occurred on a Friday night either just before or after 9 p.m. Each transaction was initiated by a visit by Department undercover investigators and a confidential informant, who purchased drugs from David Ramirez, a patron of the lounge. The informant introduced the investigators to Ramirez, who in turn sold the investigators a small quantity of cocaine. All transactions occurred at a cocktail table, except one, which took place in a restroom. No transaction involved more than two bindles of a half-gram each. Each occurred after, or slightly before, the band began to play.

"The evidence established that, with the exception of February 19, all transactions occurred in the lounge of the premises while the parties were seated at a cocktail table. The exchanges occurred over a minimal period of time. In most instances, the bindles were passed at tabletop or slightly below. . . . [¶] [O]n occasion, an employee [of petitioners] was in the vicinity of a transaction between Ramirez and one of the investigators, [but] the evidence did not clearly and convincingly establish that [petitioners'] employees should have reasonably known what was transpiring. Taken into consideration are the following factors: The generally crowded nature of the premises when the transactions occurred, the music of the band, the brief time during which the exchanges occurred and the comparatively small sizes of the bindles involved."

The evidence "failed to establish that either the licensee's management or its employees knew" of the drug transactions. The evidence also showed that petitioners' managers and employees "received no special training regarding drugs or preventative measures to control illegal transactions." No evidence was presented that there was ever any other drug activity on the premises or that petitioners were aware of any; the sole evidence of narcotic activity was that involving the undercover officers and Ramirez.

The ALJ concluded that petitioners did not know or have reason to know that the transactions were occurring and thus did not knowingly permit them. However, the Department was proceeding in light of the *McFaddin* decision, which essentially states that a licensee can be found to "permit" conduct without knowing about it. *McFaddin* also states that a licensee who "does not reasonably know of the specific drug transactions" can be considered *not*

to have permitted them if the licensee "has taken all reasonable measures to prevent such transactions." (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra,* 208 Cal.App.3d at p. 1390.) The ALJ thus focused on the preventive measures petitioners took to prevent drug trafficking on their premises. Because they were an upscale family-oriented business which did not cater to a clientele likely to engage in drug abuse, petitioners, not surprisingly, took few steps to prevent a problem of which they were unaware. The ALJ concluded: "Although the Chief of the Pleasanton police department offered a glowing assessment of [petitioners'] conduct since licensed, the evidence failed to establish what measures [petitioners] undertook to control trafficking by [their] patrons. . . . [¶] [T]he evidence failed to establish that [petitioners] undertook all reasonable steps to prevent such activity from occurring."

Based on this reasoning, the ALJ reached the conclusion that petitioners "permitted" the drug trafficking and suspended their liquor license for 60 days. Fifty days of that suspension were stayed for two years on several conditions, including the development of measures to prevent drug trafficking on the premises.

The Board adopted the ALJ's proposed decision verbatim and affirmed it, noting that there was "no evidence" that petitioners took "reasonable steps to prevent narcotic transactions." The Board interpreted *McFaddin* to mean that a licensee unaware of drug transactions may only escape discipline if he or she had imposed a regime of preventative measures.

### B. *De Lena*

Petitioner Richard De Lena operates a bar and restaurant known both as "The Don's" and "Greenhouse Bar & Restaurant" in Sebastopol. Petitioner has held an on-sale general eating place license and a caterer's permit since May 1988, with no prior record of discipline.

Petitioner's establishment is on the ground floor of a two-story building which he owns. The second floor is occupied by a residential care facility which petitioner operates for developmentally disabled persons. The ground floor is divided into a coffee shop, a dining room and a bar. The bar is separated by doors from the rest of the ground floor. Petitioner employs three bartenders and several waitresses and busboys; he has a total of twenty-one part-time and two full-time employees.

Five drug transactions were found to have occurred on petitioner's premises, four involving an off-duty employee. On February 3, 1989, a Cotati

police detective purchased a $25, .17-gram bindle of cocaine from a patron of the bar. There is no indication that any employee of petitioner was aware of the illegal sale. On February 23, March 2, March 8, and March 9, 1989, the detective returned with a female Department undercover investigator and bought methamphetamine from Cindy Calkins, petitioner's off-duty employee, who was sitting in the bar. The sales were for .50, .49, .28, and .11 grams. The sales either occurred in a restroom or covertly at a bar table, with money and drugs passed beneath the table or hidden in envelopes, candy containers or cigarette packs. Petitioner fired Calkins after her arrest for drug sales. Apparently, petitioner was unaware of this activity; there is no evidence that he knew of the sales. There is a finding that he was unaware of the Department's undercover investigation.

Petitioner had installed a video surveillance system in the bar, dining room and coffee shop. The video monitor is located in petitioner's upstairs office. Petitioner activates the monitor whenever he is in his office, from 2 to 5 p.m. and after 9:30 p.m. (He is personally in the bar between 5 p.m. and 5:30 p.m. and during most of the evening.) Only petitioner uses the video monitor.

The ALJ found that petitioner "feels strongly about the use of drugs in the premises. He has told his employees that they will be arrested if involved in drugs within the confines of the building or lot. He terminated the services of his cook in late 1988 for drug use." Petitioner's employees (along with most customers) are aware of the video surveillance.

The ALJ concluded that petitioner permitted the illegal sales on two distinct grounds: (1) that the knowledge of the four sales by the participating employee is vicariously imputed to petitioner, regardless of the employee's having been off-duty; and (2) that assuming no knowledge, actual or vicarious, petitioner "permitted" all five of the sales within the meaning of *McFaddin*. The ALJ concluded that petitioner had failed to take all reasonable measures to prevent drug transactions. The ALJ proposed a revocation of petitioner's license, stayed for two years on condition of an actual fifteen-day suspension.

The Board affirmed. The Board only briefly discussed the issue of the imputability of a bar employee's knowledge when that employee is not on duty. The Board concluded that the ALJ correctly reasoned that the on-duty/off-duty distinction is meaningless because an employee has a duty to refrain from illegal transactions on the premises at all times. The Board also reasoned that each time the employee returned to duty, her knowledge of her own illegal acts was automatically imputed to petitioner.

The Board's ruling is devoted mostly to the *McFaddin* decision and its interpretation. It is impossible to tell how much weight the Board gave to the imputed knowledge issue as opposed to the *McFaddin* issue in affirming the discipline.

## DISCUSSION

### A. *Standard of Review*

Judicial review in alcoholic beverage control matters is prescribed by statute. This court reviews the ALJ's decision for the Department, as well as the Board's affirmance. (§ 23090.3.) Under the circumstances present in these cases, our review is limited to ascertaining whether the Department acted in excess of its jurisdiction, did not proceed in a manner required by law, reached a decision unsupported by its findings, or relied on findings unsupported by substantial evidence. (§ 23090.2.)

### B. *Merits*

The crux of this case is the *McFaddin* decision, its interpretation by the Department and the Board, and its historical antecedents. In Laube, petitioners contend that *McFaddin* cannot support the action against their licenses, because under correct law a licensee cannot be found to have "permitted" activity without knowledge of it. In addition, petitioners in both Laube and De Lena take issue with the Board's interpretation of *McFaddin.* They argue that even if they were charged with some reasonable measures of preventive activity, each acted reasonably under the circumstances known to him—an absence of any reasonable expectation of drug sales on premises. In particular, petitioner De Lena argues he imposed all measures that seemed reasonable under the circumstances, only to discover after the fact that the Department, which has failed to provide guidance to licensees, did not consider those measures sufficient.

The Attorney General contends that knowledge of "permitted" behavior is not required, and that neither petitioner took sufficient preventive measures because drug transactions did in fact occur. We disagree with both contentions. Having examined in detail the historical antecedents of *McFaddin,* we respectfully conclude that the Board's interpretation of *McFaddin* is incorrect, and leads to unwarranted liability without fault on the part of the liquor licensee, is over-expansive and, as seen below, will require honest licensees of the most innocent of liquor establishments to impose Orwellian schemes of customer surveillance inconsistent with contemporary societal values. For these reasons we annul the decisions below.

### 1. *The McFaddin Decision*

The petitioner in *McFaddin* operated "Confetti," a large, popular San Diego disco. In an area of 7,500 square feet Confetti, served an average of 650 patrons per night, and as many as 1,500 on weekends. Confetti had 90 employees, 3 bars on 3 different levels, and catered to people between the ages of 21 and 36 years.

In a three-week period, undercover San Diego police officers bought small amounts of cocaine on six occasions and from four different patrons. Confetti's operator and employees did not know or have reason to know of these transactions. Confetti had, however, imposed extensive measures in an attempt to control drug trafficking by employees and patrons. These stringent measures included using polygraph tests on employees to ensure compliance with prohibitions on drug use; using undercover personnel to monitor activities of employees; the posting of conspicuous signs in the restrooms warning of arrest and prosecution for drug sales; and checks of the restrooms every 10 minutes. (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra*, 208 Cal.App.3d at pp. 1390-1391, & p. 1390, fn. 8.)

The Department charged Confetti with permitting drug sales on its premises and suspended its license. The Board affirmed. The *McFaddin* court granted a petition for review and reversed. The court stated the issue as follows: "Does the operator of a nightclub 'permit' the sale of narcotics on its premises if the operator diligently attempts to control such sales and the operator and its employees do not know, or should not reasonably know, of the specific drug transactions?" (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra*, 208 Cal.App.3d at p. 1389.) Citing *Mercurio* v. *Dept. Alcoholic etc. Control* (1956) 144 Cal.App.2d 626, 629-631 [301 P.2d 474], the court stated: "It is not necessary for a licensee to knowingly allow its premises to be used in a prohibited manner in order to be found to have permitted its use." (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra*, at pp. 1389-1390.) The court thus seems to have adopted the premise that a liquor licensee can "permit" illicit activity without being aware of it, and the Board seizes on this language.

█ The *McFaddin* court was influenced by a passage purporting to define "permit" which appears in a long line of cases in this area: "Further, 'The word " 'permit' implies no affirmative act. It involves no intent. It is mere passivity, *abstaining from preventative action.*" ' " (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra*, 208 Cal.App.3d at p. 1390, quoting *Harris* v. *Alcoholic Bev. Con. Appeals Bd.* (1963) 212 Cal.App.2d 106, 123 [28 Cal.Rptr. 74], in turn quoting *Dorris* v. *McKamy* (1919) 40 Cal.App. 267, 274 [180 P. 645], italics added by *McFaddin* court.)

This definition of "permit" is correct enough; however, a long line of California liquor license decisions have transformed this definition into something entirely different: the notion that the passive conduct of permitting something by failing to take measures to prevent it does *not* require knowledge of the thing permitted. The concept that one may permit something of which he or she is unaware does not withstand analysis. This is especially true since under section 24200, subdivision (a) and California Constitution, article XX, section 22, a license may only be suspended for good cause. *McFaddin* itself noted the problems with strict liability, or liability without knowledge on the part of the licensee, observing the "potential unfairness and possible unlawfulness of suspending or revoking a license if the licensee is blameless." (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra,* 208 Cal.App.3d at p. 1388, fn. 3.) Yet, by employing a definition of "permit" that requires no knowledge by the one granting the permission, *McFaddin* has been interpreted by the Board as imposing de facto strict liability on the licensee by charging him with "permitting" something whenever he has not taken action to prevent it, even when the licensee had no reason to know there was something that required prevention. We do not read *McFaddin* so narrowly. In a footnote, the *McFaddin* court specifically advised that it did "not reach the difficult question whether a licensee can have its license suspended or revoked without fault . . . ." (*Ibid.*)

### 2. *Antecedents of McFaddin*

The sentence in *McFaddin* on which the Board relies can best be described as the unfortunate product of line of cases whose language had become so routinely repeated and fossilized into unquestioned correctness that, like those terrified of the Great Oz, few bothered to look behind the curtain. Decades ago the liquor license cases began to quote the definition of "permit" described above and to employ the definition to preclude the requirement of licensee knowledge. An examination of those cases shows that the definition arose and was quoted and applied in a factual context involving knowledge, and that all of the liquor license decisions involved knowledge of the licensee. *None* involved disciplinary action against a licensee who did not know of the conduct "permitted."

Ironically, the definition of "permit" was first expressed not in a California liquor license decision, but in a 1900 bankruptcy decision of the federal district court of Western Pennsylvania. *In re Thomas* (W.D.Pa. 1900) 103 F. 272, involved the question whether a bankruptcy debtor "suffered" or "permitted" creditors to obtain a preference on the bankruptcy estate. Distinguishing the debtor's passive conduct from that of taking affirmative action, the federal court concluded that the debtor permitted the preference by

failing to pay past due obligations. The unpaid debts led to levies of execution which created the improper preference. "It is true [the debtor] took no active, affirmative steps to create such preference, other than the failure to meet a matured judgment note or provide for its extension; but inasmuch as she took no steps to prevent the enforcement, by sale, of such preference, she must be held to have suffered or permitted these creditors to obtain preference. 'To permit' is defined as not to hinder. Webster defines 'permit' as more negative than 'allow'; that it imports only acquiescence or an abstinence from prevention . . . . It would seem, therefore, that to permit or suffer implies no affirmative act,—involves no intent. It is mere passivity, indifference, abstaining from preventative action." (*Id.*, at pp. 273-274.)

The facts of *Thomas* strongly suggest the obvious—that the debtor knew of her matured obligations. Other language in the opinion suggests the court was not equating passivity or a failure to act with a lack of awareness. (See *In re Thomas, supra,* 103 F. at p. 275.) Knowledge was assumed. Certainly the passage just quoted does not establish that the term "permit" may be defined to exclude knowledge on the part of the actor.

The *Thomas* language migrated westward in the 1919 decision of *Dorris* v. *McKamy, supra,* 40 Cal.App. 267. *Dorris* was likewise not a liquor license case. It involved a civil action to remove a city marshal from office for failing to enforce the law. The marshal was accused of "permitting" a group of women to openly and notoriously engage in prostitution from certain buildings. The *Dorris* court evidently happened upon the definition of permit in *Thomas* and cited it in support of the comment that "permit" implies no affirmative act and is "mere passivity, abstaining from preventative action." (*Dorris,* at p. 274.) The court concluded that the marshal "permitted" the conduct by his passive inaction, but found no basis for removal because his failure to act was based on the lack of a proper warrant for arrest. Like its Pennsylvania predecessor, *Dorris* does not speak in terms of failing to prevent an *unknown* event. The marshal's knowledge of the open and notorious acts was assumed and was in fact alleged in the allegations of the complaint for removal.

*Dorris* (and by historical extension, *Thomas*) found its way into the developing law of liquor license revocation. The first such decision appears to be *Swegle* v. *State Board of Equalization* (1954) 125 Cal.App.2d 432 [270 P.2d 518], wherein a liquor licensee's license was revoked because he "permitted" fights and the presence of both disruptive drunks and practicing prostitutes on his premises. The trial court, in denying a mandate petition against the Board of Equalization, had ruled that "permit" includes an "unknowing consent" to the occurrence of illicit acts. (*Id.,* at p. 438.) The

court also ruled, in language approaching strict liability, that "a licensee can be held to have permitted acts . . . upon evidence and a showing that the acts themselves took place." (*Ibid.*) The Court of Appeal upheld this interpretation of "permit," citing the *Dorris* definition of "permit," as merely passive abstention from preventative action.

The *Swegle* court did not explain how the *Dorris* definition precluded the element of knowledge. Moreover, in the very next sentence the court states that the licensee's "agents were always present in the bar." (*Swegle* v. *State Board of Equalization, supra,* 125 Cal.App.2d at p. 438.) The court proceeded to explain that the licensee's employees were present and knew of the activity, and that their knowledge was imputed to the licensee. Thus the court employed the *Dorris* definition using language of strict liability, but on facts showing knowledge.

A similar result was reached in the case cited by *McFaddin, Mercurio* v. *Dept. Alcoholic etc. Control, supra,* 144 Cal.App.2d 626, in which the license was revoked because the licensees "permitted" cocktail waitresses to accept alcoholic beverages purchased on the premises. The licensees argued that their knowledge was a necessary element of the charge of "permitting." Citing *Swegle,* the court rejected the argument, stating emphatically that knowledge was not an element of permission. Again, however, the court stressed that one licensee was present when the acts occurred, and therefore knew about them; again, a ruling ostensibly establishing liability without knowledge was based on facts to the contrary.

In *Givens* v. *Dept. Alcoholic Bev. Control* (1959) 176 Cal.App.2d 529 [1 Cal.Rptr. 446], the licensee was clearly aware of the occurrences which led to his license being revoked. He was charged with "suffering" or "permitting" activities which made his bar a "disorderly house": frequent fights, one of which led to a murder; frequent presence of pimps, prostitutes and drug dealers; and frequent loud and disorderly behavior by drunken patrons. The licensee's defense was that he had tried to take steps to correct the problems and failed. The court held he had permitted the conduct by failing to take sufficient curative steps, e.g., soliciting the aid of the local police. The court cited *Swegle* for the proposition that "acquiescence is nonetheless permission" (*id.,* at p. 534), but clearly that acquiescence was with the licensee's knowledge. The court's comment that "[i]f, as in this present case, the overwhelming evidence shows that the tavern is in fact a 'disorderly house,' there can be but one conclusion: that the licensee has permitted or suffered such a condition to exist" (*ibid.*) does not embrace strict liability unless lifted out of context.

In *Benedetti* v. *Dept. Alcoholic Bev. Control* (1960) 187 Cal.App.2d 213 [9 Cal.Rptr. 525], the license was revoked because the licensee permitted his

bar to be, in the parlance of the time, " 'a resort' for sexual perverts." (*Id.*, at p. 217.) Although the court relied heavily on *Mercurio* and *Givens* and used their language of strict liability, the evidence before it showed that both the licensee and his employees witnessed and were aware of certain sexual activity occurring on the premises.

In *Morell* v. *Dept. of Alcoholic Bev. Control* (1962) 204 Cal.App.2d 504 [22 Cal.Rptr. 405], the license was also revoked for the licensee's permitting overt homosexual activity on the premises. Citing *Swegle, Givens,* and *Benedetti*, the court concluded that "[n]o proof of knowledge by the licensee or his agents of the acts proscribed by the section is necessary, it being sufficient that the evidence show that such acts took place on the licensed premises." (*Id.*, at pp. 511-512.) This clear-cut statement of liability without fault is simply out of place: the evidence was replete with indications that the licensee's employees repeatedly witnessed the targeted behavior of the patrons.

In *Harris* v. *Alcoholic Bev. Con. Appeals Bd.*, *supra*, 212 Cal.App.2d 106, the license was revoked for keeping a premises of disorderly drunks. The licensees argued they did not know of the dozens of arrests of drunken patrons. The court cited the *Dorris* definition, as well as the declarations in *Givens* and *Morell* that it is sufficient if the acts took place. (*Id.*, at pp. 123-124.) Once again, the court spoke of strict liability in a case of constructive knowledge by the licensee: the frequent arrests for public drunkenness "were open and in full view and thus easily detectable by the bartender's discerning eye." (*Id.*, at p. 120.)

In contrast to the foregoing line of cases suggesting strict liability, two decisions suggest that the licensee's knowledge is essential. In *Marcucci* v. *Board of Equalization* (1956) 138 Cal.App.2d 605 [292 P.2d 264], the licensee was charged under section 24200 with permitting a minor to consume beer on her premises. The licensee's bartender observed the obvious transgression. The court concluded: "A licentiate conducting the sale of beverages under an on-sale license is charged with an active duty to prevent minors from consuming intoxicating liquor on the licensed premises, *and if the licentiate, through an employee, has knowledge that such consumption is taking place*, there arises immediately an active duty to prevent its continuance. *A failure to prevent it is within the meaning of the statute [section 24200] a permitting of that unlawful consumption.*" (*Id.*, at p. 610, italics added.)

In a related context, in *Reilly* v. *Stroh* (1984) 161 Cal.App.3d 47 [207 Cal.Rptr. 250], the court held that once a licensee knew of a violation of

public morals on his or her premises, the licensee's preventative measures had to be successful. Significantly, the *Reilly* court repudiated the language of strict liability and embraced *Marcucci*.

### 3. *Evaluation of McFaddin and Its Interpretation*

An ancient definition of "permit" as passive conduct has been gratuitously used by several California decisions to suggest that a liquor licensee can be held strictly accountable, without knowledge, notwithstanding the constitutional and statutory requirement of "good cause" for adverse action against a license. We respectfully differ with the Board's perception of *McFaddin* and its antecedents, and hold that a licensee must have knowledge, either actual or constructive, before he or she can be found to have "permitted" unacceptable conduct on a licensed premises. It defies logic to charge someone with permitting conduct of which they are not aware. It also leads to impermissible strict liability of liquor licensees when they enjoy a constitutional standard of good cause before their license—and quite likely their livelihood—may be infringed by the state.

The problem of drug trafficking obviously warrants the utmost attention, and the general association between such trafficking and bars is well known. But the solution is not to impose strict liability on any licensee, even those running upscale establishments without a hint of suspicion of illicit conduct on their premises, simply because a drug transaction occurs. The *McFaddin* ruling has been interpreted by the Department and the Board in exactly this fashion. The *McFaddin* decision has inadvertently resulted in what the licensing authorities have dubbed the "*McFaddin* defense." The unsuspecting licensee is strictly liable solely because a drug transaction occurred, unless it had engaged in preventive activity. Aside from the absurdity of having to impose a preventative regime against an evil not reasonably suspected, this defense requires the licensee to impose precisely the severe, intrusive measures employed by the disco in *McFaddin*. In both of the cases before us, the Board compared the measures taken by the establishment with those in *McFaddin*. The Board's adhesion to the facts of *McFaddin* can lead, as it has in these cases, to absurd and unjust results.

The Board seems to assume that all bars are dens of drug trafficking. The Attorney General seemed to take that position at oral argument, and told this court that all bars must impose a regime of surveillance. However, not all purveyors of spirits preside over markets of illicit substances. Certain establishments with liquor licenses, because of their size, location or style of clientele, may simply not pose a reasonable suggestion of drug trafficking. Certain of San Francisco's finest and world-famous hotels come immediately

to mind. One can imagine other establishments where the most moralistic and law-abiding licensee, catering to a similar clientele, would be forced to install surveillance cameras, spy on its own employees, and subject them to lie detector tests just in case an isolated drug transaction occurs under one of its tables. Suppose a retired parson opens the "Thirsty Deacon Bar" and caters to the local clergy hankering for a small glass of sherry after a long dry day of sermon practice. Suppose a retired police officer, prosecutor or lawyer opens a select pub near a federal courthouse and caters to drug enforcement agents, United States attorneys and the occasional member of the federal bench. The Board would impose an Orwellian regime of surveillance, polygraph testing and undercover spying in an establishment of impeccable morals or of the finest *nouvelle cuisine*. The Board lost sight of the fact that *McFaddin* involved a huge disco catering to the youthful recreants most likely to use controlled substances; the intrusive measures found apt in that case cannot reasonably be required of all liquor licensees. Not all premises licensed to serve alcohol are potential opium dens. The war on drugs may well be a "just war," but the Board is taking the battle to noncombatants.

In response to an argument of this tenor raised by petitioners, the Attorney General contends that because drugs are commonly sold in bars, all bar owners must take reasonable preventative steps. This position still effectively imposes strict liability, subject to the Board's new-found *"McFaddin* defense." Not only did *McFaddin* specifically refrain from imposing liability without fault (*McFaddin San Diego 1130, Inc.* v. *Stroh, supra,* 208 Cal.App.3d at p. 1388, fn. 3), the Department conceded in Laube that it was *not* proceeding on a theory of strict liability. The Board and Department do not seem to understand that strict liability results from their interpretation of *McFaddin.*[2]

---

[2]One aspect of the knowledge issue has not been raised. Some cases have ruled that because the Legislature used the phrase "knowingly permit" in section 24200.5, subdivision (a), and did not use the word "knowingly" in section 24200, knowledge is not required. (See, e.g., *Benedetti* v. *Dept. Alcoholic Bev. Control, supra,* 187 Cal.App.2d at p. 216.) This argument was not raised before the ALJ or the Board and is not raised in this court by the Attorney General.

Another aspect of the knowledge issue was briefly alluded to by the Board, but is without merit. The Board concluded in a tortuous manner that the Laube petitioners must have had knowledge of posited, but uncharged, drug trafficking—which they vigorously deny—because of an argument made before the Board. Petitioners had attempted to fashion a crude equal protection argument, based on section 24202, subdivision (b), which provides that if a licensee reports drug trafficking the license cannot be revoked solely on the basis of the conduct reported. Petitioners had argued that the protection afforded reporting licensees, compared to their suspension without fault, violated equal protection. The Board concluded that since petitioners relied (however abstractly) on the reporting statute they must have known of other drug-dealing activity. This reasoning is dubious at best and sophistic at worst.

The *Marcucci* case perhaps states it best. ■ A licensee has a general, affirmative duty to maintain a lawful establishment. Presumably this duty imposes upon the licensee the obligation to be diligent in anticipation of reasonably possible unlawful activity, and to instruct employees accordingly. Once a licensee knows of a particular violation of the law, that duty becomes specific and focuses on the elimination of the violation. Failure to prevent the problem from recurring, once the licensee knows of it, is to "permit" by a failure to take preventive action. This is a more reasonable alternative to the Board's interpretation of *McFaddin*, and one more consistent with logic and reasonable fairness. The Attorney General, at oral argument, essentially conceded the point by stating that his main concern—which we certainly share—was the Department's ability to act against the licensee who *knows* of illicit activity and fails to prevent its recurring.

In addition, if the Department believes that certain minimal measures should be taken by all licensees to detect drug trafficking, it can implement guidelines for the assistance of the licensee, rather than impose the severe surveillance regime which happened to be found suitable under the extreme facts of *McFaddin*.

### DISPOSITION

In Laube the sole basis for the action against the license was the failure to satisfy the "*McFaddin* defense." Accordingly, the decision of the Department and that of the Board in Laube is annulled.

In De Lena, it is impossible to determine from the Board's decision to what extent the action against the license was based on the *McFaddin* issue or on the imputation to petitioner of the knowledge of the off-duty employee. Rather than resolving that issue at this time, we annul the decision of the Department and that of the Board and remand the matter for reconsideration of discipline without the *McFaddin* component of the Department's reasoning.

King, P. J., and Low, J.,* concurred.

A petition for a rehearing was denied February 3, 1992.

---

*Retired Presiding Justice of the Court of Appeal, First District, sitting under assignment by the Chairperson of the Judicial Council.