[No. G032058. Fourth Dist., Div. Three. Jan. 29, 2004.]

THANH THUY VO et al., Plaintiffs and Respondents, v.
CITY OF GARDEN GROVE et al., Defendants and Appellants.

**COUNSEL**

Woodruff, Spradlin & Smart, John R. Shaw and M. Lois Bobak for Defendants and Appellants.

Ronald Talmo for Plaintiffs and Respondents.

**OPINION**

**IKOLA, J.**—The City of Garden Grove (city) enacted an ordinance (1) requiring "CyberCafes" to obtain a conditional use permit (CUP) to continue

in business, and (2) regulating their operations.[1] Several CyberCafe owners (plaintiffs) sought a preliminary injunction, contending portions of the ordinance infringed free speech and privacy rights protected by the First Amendment of the United States Constitution and article I, sections 1 and 2 of the California Constitution. The court preliminarily enjoined the city from enforcing portions of the CyberCafe ordinance, and the city appeals. We conclude the court abused its discretion by preliminarily enjoining enforcement of the operational regulations, but appropriately exercised its discretion when it enjoined enforcement of the CUP requirement. Accordingly, we affirm the order in part and reverse it in part.

## FACTS AND PROCEDURAL BACKGROUND

By memorandum of December 31, 2001, Joseph M. Polisar, the city's chief of police, advised the city manager of the rapid growth in the number of CyberCafes operating in the city. In the space of two years, the number of these establishments had risen from three to a total of 20. Polisar's memorandum detailed seven incidents of criminal activity occurring in or near four different CyberCafes during the last three months of 2001. Five of the seven incidents involved gang activity. The most recent incident, occurring the day before the memorandum was written, was the murder of a 20-year-old male while he was standing in front of a CyberCafe. Polisar also reported that patrol officers were finding schoolage children at these establishments during school hours, and he expressed concern about minors being able to access inappropriate and dangerous Web sites. Polisar concluded: "[T]he Police Department believes that it is vital that the City enact an ordinance regulating the use of 'Cyber Cafe's [sic].' "

The city council responded quickly by enacting an emergency interim ordinance, which established a moratorium on any new CyberCafes and imposed certain operating restrictions on existing CyberCafes. By memorandum dated June 18, 2002, Polisar reported 10 additional incidents of criminal activity, which he associated with CyberCafes and which had occurred while the city was working on the draft of a new permanent ordinance. Also by this date Polisar reported 22 CyberCafes operating in the city, apparently an increase of two despite the enactment of the emergency moratorium. On July 9, 2002, the city council adopted ordinance No. 2573, its first attempt to

---

[1] The CyberCafe ordinance defines a "CyberCafe" as an establishment that provides Internet access to fee paying customers. The ordinance also states that a "CyberCafe" is synonymous with a "PC Cafe," "Internet Cafe," and a "Cyber Center[]."

regulate CyberCafes with a permanent ordinance, with an effective date 30 days thereafter, August 8, 2002.

Before the effective date of ordinance No. 2573, the owners of five CyberCafes filed this action, seeking (1) damages pursuant to 42 United States Code section 1983 for the deprivation of rights, privileges and immunities secured by the federal and state Constitutions, (2) declaratory relief concerning the validity of the ordinance, and (3) a temporary restraining order, preliminary injunction and permanent injunction against enforcement of the ordinance. The court issued a temporary restraining order on August 7, 2002, and ordered the city to show cause, at a hearing scheduled for August 29, 2002, why a preliminary injunction should not issue restraining enforcement of the ordinance during the pendency of the action.

Although the record on appeal does not clearly indicate all of the subsequent proceedings, it appears no hearing was held on the request for preliminary injunction until January 30, 2003. By that time, three of the plaintiffs had dismissed their action as a result of a settlement, and the city had enacted ordinance No. 2591, substantially amending ordinance No. 2573. In connection with consideration of the new ordinance, Chief Polisar updated his report by memorandum dated November 20, 2002, this time reporting 23 CyberCafes in the city despite the moratorium, and "289 police activity calls since June 1, 2002." Details of these "police activity calls" were not provided in the memorandum.[2]

Ordinance No. 2591 was passed by the city council on December 10, 2002. The hearing on the preliminary injunction began on January 30, 2003, but

---

[2] The dissenting opinion faults us for not referencing "one of the most interesting parts of the record, which is a survey of the problems which surrounding cities . . . have had with cybercafes." While we fail to understand why problems, or the lack of them, in other jurisdictions should affect the city's ability to address *its* problems, let us set the record straight. The dissent trumpets this survey as evidence that "[t]here is nothing *inherently* attractive about cybercafes to 'gangs' " because "instances of gang violence are simply not to be found in that table." But the dissent fails to point out that many of the surrounding cities had already adopted regulations similar to the Garden Grove ordinance. Most of the other cities reported only two or three CyberCafes in their jurisdictions, compared to Garden Grove's 23. Eleven cities reported they had at least one CyberCafe (Anaheim, Cerritos, Cypress, Fountain Valley, Huntington Beach, La Habra, Long Beach, Los Alamitos, Monterey Park, Orange, and Walnut). Four of the 11 (36 percent) had a daytime curfew for minors (Cypress, Huntington Beach, Long Beach, and Los Alamitos). Two of the 11 (18 percent) required video surveillance (Cerritos, Fountain Valley). Three of the 11 (27 percent) required adult supervision or otherwise regulated the number of employees required on premises (Cerritos, Cypress, and Walnut). Eight of the 11 (73 percent) regulated the hours of operation generally (Anaheim, Cerritos, Cypress, Fountain Valley, Huntington Beach, Long Beach, Orange, and Walnut). The city council could well have concluded from this evidence that these types of operational regulations were a deterrent to criminal activity at CyberCafes.

before it was completed, the court called a recess to allow the parties to discuss settlement possibilities. Settlement was not achieved, and the hearing was eventually completed on February 27, 2003. The court took the matter under submission and, on March 21, 2003, issued its ruling "striking" portions of the CyberCafe ordinance (the ordinance).[3]

The ordinance required existing CyberCafes to apply for a CUP no later than July 31, 2003.[4] The court enjoined enforcement of this provision, finding it to be "constitutionally impermissible," because it "allows unfettered discretion in the issuance of permits . . . and does not withstand challenge as being narrowly tailored and operates as a prior restraint and is therefor[e] facially defective."

Portions of the ordinance limited hours of operation and imposed a special curfew for minors during school hours unless accompanied by their parent or guardian. The court enjoined the provisions restricting access by minors during school hours. The court found restricting the "presence of minors during public school hours bears no basis to the declared legislative intent of public safety," and requiring the presence of a parent or guardian during school hours "is overly burdensome . . . and not narrowly tailored." The ordinance also imposed minimum requirements for the number of employees on the premises, and required the presence of licensed, uniformed security guards on Friday and Saturday evenings. The court enjoined these provisions finding insufficient "justification for accomplishing the legitimate governmental interest of public safety . . . and not sufficiently narrowed."

Finally, the court enjoined a provision of the ordinance requiring CyberCafes to maintain a video surveillance system. It found this requirement imposed "an undue burden without adequate justification . . . and [was] not sufficiently narrow."

## DISCUSSION

*Standard of Review*

"We review an order granting a preliminary injunction under an abuse of discretion standard. [Citations.] Review is confined, in other words, to a

---

[3] The "ordinance" consists of ordinance No. 2573, as amended by ordinance No. 2591. The order entered by the court on March 21, 2003, is not in the form of an injunction. Instead, the order "strikes" certain sections of the ordinances. Further, the order is not, by its terms, limited in duration to the period the action remains pending. But both parties treat this order as a preliminary injunction from which the city appeals. (Code Civ. Proc., § 904.1, subd. (a)(6).)

[4] We describe the challenged portions of the ordinance in greater detail in our discussion of their validity, *post.*

consideration whether the trial court abused its discretion in ' "evaluat[ing] two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued." ' " (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109 [60 Cal.Rptr.2d 277, 929 P.2d 596].)

But "[w]here the 'likelihood of prevailing on the merits' factor depends upon a question of law . . . the standard of review is not abuse of discretion but whether the superior court correctly interpreted and applied [the] law, which we review de novo." (*Efstratis v. First Northern Bank* (1997) 59 Cal.App.4th 667, 671–672 [69 Cal.Rptr.2d 445].) Constitutional issues are always reviewed de novo. (*State of Ohio v. Barron* (1997) 52 Cal.App.4th 62, 67 [60 Cal.Rptr.2d 342].) Here, the likelihood of prevailing on the merits *does* depend upon a question of law, because we are asked to conduct a facial review of the ordinance to determine whether it is constitutional. We conduct that review de novo. Of course, enjoining enforcement of a constitutional ordinance, or failing to enjoin enforcement of an unconstitutional ordinance, would also constitute an abuse of discretion within the usual formulation of the standard of review for the grant or denial of a preliminary injunction.[5]

### 1. *Likelihood of Prevailing on the Merits*

Plaintiffs challenge the ordinance primarily on First Amendment grounds. We have no doubt the ordinance implicates First Amendment activities. CyberCafes provide their customers with access to the Internet, allowing users to communicate privately by e-mail, acquire vast amounts of information from the World Wide Web, and even play interactive games. Commercial book publishers and distributors have long been entitled to First Amendment protection (*Smith v. California* (1959) 361 U.S. 147 [4 L.Ed.2d205, 80 S.Ct. 215]; *Perrine v. Municipal Court* (1971) 5 Cal.3d 656 [97 Cal.Rptr. 320, 488

---

[5] The dissenting opinion would uphold the court's injunction against enforcement of the ordinance's video surveillance requirements on the ground, inter alia, that the order is supported by substantial evidence. Thus, according to the dissent, substantial evidence supports the court's injunction because only five of 23 CyberCafes have "experienced serious crime of any kind." On this issue, the dissent applies the wrong standard of review. As we will explain, it is for the city council to decide whether the evidence supports the adoption of a regulation to advance its governmental interest. It is our task to decide whether the regulation adopted by the city is a reasonable time, place and manner restriction to the extent First Amendment activities are affected, and to balance the adopted regulation against any privacy interest to the extent privacy interests are affected. It is distinctly *not* our task to decide whether the evidence supports the city council's decision to regulate in the manner it has. The dissent puts the wrong items on each side of the scale.

P.2d 648]), as have the proprietors of video arcades (*People v. Glaze* (1980) 27 Cal.3d 841 [166 Cal.Rptr. 859, 614 P.2d 291]), cabarets (*Sundance Saloon, Inc. v. City of San Diego* (1989) 213 Cal.App.3d 807 [261 Cal.Rptr. 841]), and movie theaters (*Burton v. Municipal Court* (1968) 68 Cal.2d 684 [68 Cal.Rptr. 721, 441 P.2d 281]). We perceive no rationale by which CyberCafes should be accorded less protection than any of these older or more traditional businesses. As the court below aptly observed, "The targeted business is a gateway to the information super highway[—]the modern new location for information's dissemination."[6]

The fact that First Amendment rights are affected, however, does not end the analysis. "That First Amendment rights are being utilized on the premises does not exempt a commercial entrepreneur from compliance with reasonable regulations under the police power." (*Burton v. Municipal Court, supra,* 68 Cal.2d 684, 690.) "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions . . . . [R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." (*Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 293 [82 L.Ed.2d 221, 104 S.Ct. 3065].) "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 109 S.Ct. 2746].) "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " (*Id.* at p. 799.) "[T]his standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests." (*Ibid.*) But provided "the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." (*Id.* at p. 800.)

■ When, however, an ordinance or regulation requires permission of the government, such as a permit or license, before engaging in protected First Amendment activity, " ' "precision of regulation must be the

---

[6] We find it wholly unnecessary to the analysis, however, to adopt the dissent's unsupported assumption that CyberCafes are the means by which poor people "who cannot afford computers (or, often, who cannot afford very high speed internet connections)" gain freedom of the press, or that CyberCafes "are the poor man's printing press and private library." Our analysis is independent of the assumption about the customer's wealth.

touchstone" '[citation] and the standards set forth therein must be 'susceptible of objective measurement.' " (*Burton v. Municipal Court, supra,* 68 Cal.2d 684, 691.) Ordinances governing the issuance of licenses fail to survive constitutional scrutiny where administrative officials are "granted excessive discretion in determining whether to grant or deny the license." (*Ibid.*; see also *City of Lakewood v. Plain Dealer Pub. Co.* (1988) 486 U.S. 750, 757 [100 L.Ed.2d 771, 108 S.Ct. 2138] ["in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship"].)

## 2. *Balance of Hardships*

An evaluation of the relative harm to the parties upon the granting or denial of a preliminary injunction requires consideration of: "(1) the inadequacy of any other remedy; (2) the degree of irreparable injury the denial of the injunction will cause; (3) the necessity to preserve the status quo; [and] (4) the degree of adverse effect on the public interest or interests of third parties the granting of the injunction will cause." (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286, fn. 5 [219 Cal.Rptr. 467, 707 P.2d 840].) In this connection, another division of this court has held that regulation of business activities incidentally affecting the exercise of First Amendment rights does not automatically trigger a finding of irreparable harm. (*Sundance Saloon, Inc. v. City of San Diego, supra,* 213 Cal.App.3d 807, 814–818.) Irreparable harm from enforcement will not be recognized where the time, place and manner restrictions on First Amendment activities are narrowly drawn and adopted for legitimate governmental reasons, and where the restrictions are not otherwise constitutionally infirm. (*Id.* at p. 817.)

## *The Challenged Provisions of the Ordinance*

We apply the above principles to determine whether the court abused its discretion when it impliedly found plaintiffs had established a likelihood of prevailing on the merits and the balance of hardships tipped in favor of plaintiffs.

### 1. *The Conditional Use Permit Requirement Is Invalid Under the Existing Zoning Ordinance*

Section 5 of ordinance No. 2573[7] requires existing CyberCafes to apply for a CUP no later than July 31, 2003, and waives the city's usual processing fee for such a permit. Ordinance No. 2591 added chapter 8.82 to the Garden Grove Municipal Code. Chapter 8.82 established regulations for the operation

---

[7] Section 5 of ordinance No. 2573 was not amended by ordinance No. 2591.

of CyberCafes, some of which are described, *post*. As relevant to the requirement of a CUP, however, section 8.82.030 of the new chapter 8.82 provides that conditions imposed by the CUP can override the general regulations established by Chapter 8.82. Specifically, the new section 8.82.030 states in part: "In the event that a use permit has been issued for a CyberCafe and the use permit conditions differ from the regulations established under Chapter 8.82 or are in addition thereto, then the use permit conditions shall govern and supercede over Chapter 8.82 regulations." In short, the regulations established by chapter 8.82 do not bind the zoning administrator in determining the appropriate conditions to attach to the CUP. Thus, as plaintiffs correctly observe, "[t]he net effect of [section 8.82.030] is to change the regulations listed in [chapter 8.82] as suggestions to the zoning administrator which he or she can use or not use."

To find the standards under which a CUP may be issued, one turns to section 9.24.030 of the Garden Grove Municipal Code, which governs land use actions and permits generally, including the issuance of a CUP. Section 9.24.030, subdivision (D)(4)(b), provides in part: "The hearing body shall approve an application for a conditional use permit when the information submitted by the applicant and/or presented at public hearing substantiates the following findings: [¶] . . . [¶] (ii.) That the requested use at the location proposed will not: [¶] Adversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area, or [¶] Unreasonably interfere with the use, enjoyment or valuation of property of other persons located in the vicinity of the site, or [¶] Jeopardize, endanger or otherwise constitute a menace to public health, safety or general welfare; [¶] . . . [¶] The hearing body shall deny the application when the information submitted by the applicant and/or presented at the public hearing fails to substantiate such findings."[8]

Plaintiffs established a likelihood of prevailing on the merits in their facial challenge to the CUP requirements of the ordinance. As our California Supreme Court long ago concluded: "A long line of decisions has held unconstitutional ordinances governing the issuance of licenses to conduct First Amendment activities where administrative officials were granted excessive discretion in determining whether to grant or deny the license." (*Burton v. Municipal Court*, *supra*, 68 Cal.2d 684, 691.) In *Burton*, the court reviewed a municipal licensing ordinance that required motion picture operators to obtain a license from the Board of Police Commissioners. Inter alia, the ordinance allowed the board to "deny a permit if it finds that 'the said operation will not comport with the peace, health, safety, convenience, good

---

[8] The zoning administrator is identified as the "[f]inal hearing body" for conditional use permits, and the "[a]ppeal body" is identified as the planning commission. (Garden Grove Mun. Code, § 9.24.030, subd. (B).)

morals, and general welfare of the public.' " (*Id.* at p. 687.) The *Burton* court invalidated this ordinance, finding "that it does not provide precise standards capable of objective measurement—the sensitive tools to be employed whenever First Amendment rights are involved." (*Id.* at p. 692.)

In *City of Lakewood v. Plain Dealer Pub. Co.* (1988) 486 U.S. 750 [100 L.Ed.2d 771, 108 S.Ct. 2138], the high court explained why a facial challenge to a licensing statute that "vests unbridled discretion in a government official . . . whether to permit or deny expressive activity" (*Id.* at p. 755) is allowed without the necessity of first applying for and being denied a license. "First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." (*Id.* at p. 757.) "Second, the absence of express standards makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." (*Id.* at p. 758.)

Defendant argues the ordinance "does not pose a significant threat to either of the risks identified by the *City of Lakewood* Court." The city makes the ipse dixit assertion "[t]here is simply no risk that an applicant for a CUP will somehow limit or otherwise censor the internet access of its patrons . . . in order to make it more likely that they will be granted a CUP." But the plain language of the ordinance does not support the city's assertion. The ordinance governing the issuance of a CUP authorizes the zoning administrator, inter alia, to deny the application if the applicant fails to substantiate that issuance of the CUP will not "[j]eopardize [the] general welfare." Surely this type of "unbridled discretion" to deny a CUP could well intimidate the applicant, for example, to propose software filters to limit full access to the Internet to better persuade the zoning administrator the proposed CyberCafe would not jeopardize the general welfare.

The city also asserts it "has no control whatsoever over the websites accessed by patrons of cyber cafes." But it does. Under the ordinance, the zoning administrator has unfettered discretion in deciding what conditions to impose when issuing a CUP. The city does not identify how or in what manner that discretion is limited, and without objective standards, the zoning administrator retains the power to require software filters restricting access to any designated Web site.

Finally, the city argues it has given a narrowing construction to the CUP standards by granting a permit to owners "who have agreed to abide by the

time, place and manner regulations." But the record contains no evidence to support this assertion. The city points to the settlement agreements with the plaintiffs who dismissed their actions, but these agreements are not a part of the record. Also, the conditions granted to three plaintiffs in settlement of litigation do not reasonably establish a "narrowing construction" of a facially unconstitutional permit requirement.

■ We conclude plaintiffs established a likelihood of prevailing on the merits with respect to the CUP requirement of the ordinance. "The [zoning administrator's] ability to make decisions based on ambiguous criteria such as the 'general welfare' of the community effectively gives the [zoning administrator] the power to make decisions on any basis at all, including an impermissible basis, such as content-based regulation of speech." (*Dease v. City of Anaheim* (C.D.Cal. 1993) 826 F.Supp. 336, 344.) We also conclude the interim harm to plaintiffs that would be caused by denial of the preliminary injunction outweighs the harm to defendant if the injunction is granted. Subjecting plaintiffs to a facially unconstitutional requirement as a condition to the continued operation of their business is a far more serious consequence to plaintiffs than is the consequence to defendant of not being able to impose a new CUP requirement on existing businesses. The court did not abuse its discretion in preliminarily enjoining enforcement of this portion of the ordinance.

### 2. *Plaintiffs' Facial Challenge to the CUP Requirement Is Not Time Barred*

The city contends plaintiffs' facial challenge to the CUP requirement is time barred by section 65009, subdivision (c)(1)(B) of the Government Code which requires any action "[t]o attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance" be commenced and served on the legislative body within 90 days after the legislative body's decision. The city argues it was not until January 15, 2003, when plaintiffs filed points and authorities in support of their application for preliminary injunction, that "[p]laintiffs raised for the first time the issue of whether the CUP requirement was valid," and the complaint "was not amended to assert a constitutional challenge against the CUP requirement until February 25, 2003." Observing that ordinance No. 2573 became effective on August 8, 2002, the city asserts the time to mount a facial challenge expired on November 6, 2002. We disagree. Plaintiffs are not time barred from challenging *any* portion of the ordinance.

In the original complaint, filed on July 30, 2002, nine days before the effective date of ordinance No. 2573, plaintiffs alleged "the face of the Ordinance [No. 2573], as well as its application, are unconstitutional, both

state and federal, for several reasons, including, but not limited to the fact that it is vague, ambiguous and overbroad on its face, that it is being applied unequally, that in its application it restricts the right of free speech and assembly designed to communicate and disseminate ideas and information." In seeking declaratory relief, plaintiffs alleged, "the Ordinance [No. 2573] is invalid and unenforceable, both on its face and as construed and applied by Defendants." Plaintiffs prayed for "an order imposing a temporary restraining order, a preliminary injunction and a permanent injunction against Defendants . . . enforcing the Ordinance [No. 2573] in any manner," and for a declaration "that the Ordinance [No. 2573] is unconstitutional, invalid and void on its face and or as applied to Plaintiffs."

■ Thus, the original complaint did not limit plaintiffs' challenge to specified parts of the ordinance. The entire ordinance was challenged when the complaint was filed. Under these allegations, plaintiffs are not required to seek relief from every part of the ordinance by way of preliminary injunction on pain of being time barred as to other parts when the case is tried on the merits. Plaintiffs may choose those parts of the ordinance most likely to qualify for preliminary relief and reserve their challenge on other parts to the time of trial on the merits. Similarly, plaintiffs may surely expand or contract the preliminary relief they seek, so long as that relief is encompassed within the allegations made in the complaint. The city cites no authority that would forever limit plaintiffs to the arguments made in their first memorandum of points and authorities filed with their application for a temporary restraining order. The contention that plaintiffs are time barred from contesting the CUP requirement is without merit.

### 3. *The Daytime Curfew for Minors is Valid*

Ordinance No. 2591 added section 8.82.020, subdivisions (1) and (2) to the Garden Grove Municipal Code, which establish restrictions on the hours of operation and the hours during which minors are permitted on the premises of a CyberCafe. With respect to the hours for minors, section 8.82.020, subdivision (1) provides: "Minors may not enter or remain in a CyberCafe establishment on any day after 10 p.m.; or between the hours of 8 a.m. and 3 p.m. during those weekdays when the public school system within the City jurisdiction is open and classes are being conducted. [¶] . . . [¶] This time restriction shall not apply when a minor is accompanied by a parent or guardian (with the guardian being able to authenticate guardianship)." With respect to overall hours of operation, section 8.82.020, subdivision (2) provides: "The hours of operation shall be limited to 7 a.m. to 1 a.m., daily; excepting Friday and Saturday nights wherein hours of operation shall be limited to 7 a.m. to 2 a.m."

The court enjoined only that part of section 8.82.020 that prohibits minors from entering or remaining in a CyberCafe during school hours on schooldays (the daytime curfew), and this is the only portion of the curfew provisions argued on this appeal. Accordingly, we limit our review to the daytime curfew.

Because the daytime curfew restricts the ability of minors to communicate on the Internet at CyberCafe locations during seven consecutive hours each school day, we review this regulation to determine whether it is a reasonable time, place, and manner restriction on First Amendment activities. As noted, *ante*, a reasonable time, place, and manner restriction on First Amendment activities is constitutionally permissible if it is content neutral, is narrowly tailored to serve a significant governmental interest, and ample alternative channels for communication remain open. (See *Clark v. Community for Creative Non-Violence, supra,* 468 U.S. 288, 293.) The court found the restriction to be content neutral, and we agree. Plaintiffs confine their argument to the second prong, i.e., they assert the restriction on daytime access by minors is not narrowly tailored to serve a significant governmental interest.

The city urges public safety generally, and concern for the safety and well being of minors specifically, as the significant governmental interests served by the ordinance.[9] Ordinance No. 2573 recites earlier findings made by the city council in connection with the interim urgency ordinance that "a significant number of crime and gang related activities were occurring in and about certain businesses commonly known as 'CyberCafes,' " and that "reasonable time, place, and manner regulations" were "necessitat[ed]" because "CyberCafes have been continuously and systematically visited by gang members." The city council made additional findings when it adopted Ordinance No. 2591, including: "A significant number of patrons [at CyberCafes] are minors"; "A consistent pattern of violence has occurred in and about CyberCafe locations"; "Gang activity has been documented by the Police Department at a number of these businesses"; "In two separate incidents (12/30/01 & 6/08/02), two minors were murdered in connection with Cyber-Cafe operations"; "Numerous physical assaults have occurred at CyberCafe locations . . . and two other cases of shootings have been documented"; and "The enactment of time, place, and manner restrictions as provided herein will provide measures to reduce the potential for crime activity at these locations."

---

[9] The city does not argue the daytime curfew serves any interest in enforcing the Compulsory Education Law, Education Code, section 48200 et seq. Nor do plaintiffs argue the daytime curfew is preempted by state law. (See *Harrahill v. City of Monrovia* (2002) 104 Cal.App.4th 761 [128 Cal.Rptr.2d 552] [citywide daytime curfew for minors during school hours not preempted by state law].) Accordingly, we express no opinion with respect to state preemption.

We recognize "courts should not too readily discount the stated need for and justifications expressed by legislative bodies in support of laws even when those laws incidentally affect First Amendment rights." (*Sundance Saloon, Inc. v. City of San Diego, supra,* 213 Cal.App.3d 807, 821.) Still, we are cautioned "the ordinary deference a court owes to any legislative action vanishes when constitutionally protected rights are threatened. 'The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice.' " (*Spiritual Psychic Science Church v. City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119].)

Without question, the city has a substantial interest in public safety, and in the safety and well being of minors specifically. (See *Sable Communications of California, Inc. v. F.C.C.* (1989) 492 U.S. 115, 126 [106 L.Ed.2d 93, 109 S.Ct. 2829].) Thus, the issue we decide is whether the daytime curfew is narrowly tailored to advance that interest. We conclude the daytime curfew passes constitutional muster as a narrowly tailored restriction that advances the city's interest in the safety and well-being of minors.

Chief Polisar's memorandum of November 20, 2002, which was provided to the city council in connection with its consideration of ordinance No. 2591, reported CyberCafes "attract gang members and juveniles as patrons," and had generated "289 police activity calls since June 1, 2002." The memorandum also told the city council: "The Cyber Cafes have become a business type of choice for non-territorial gang members to congregate. The chosen establishments become an informal gang turf for the members of the gang and by using formal and informal methods of communication, these establishments quickly become known in the gang community as gang hangouts. Gang members know which businesses have been chosen by rival gang members to frequent. Unfortunately, the presence of gang members in an environment where minors are present can have unsettling effects. *Minors can be recruited into the gangs, may be exposed as witnesses to gang violence, or most severely, may become innocent victims of gang violence.* The police department has several documented crimes where gang members have shot weapons from the outside of Cyber Cafes into the business. . . . Since the non-territorial gang members have chosen to use Cyber Cafes as their chosen business to frequent, the potential for gang violence is increased at these establishments." (Italics added.)

From the information provided, the city concluded that excluding minors from CyberCafes during school hours would advance its significant public interest in their protection and safety. That conclusion is reasonable. Although parents presumably believe their minor children are in school while it is in session, they are not in a position to assert direct supervision and control

during school hours. As noted by the chief of police, if CyberCafes allow minor children on the premises during school hours, the potential that gang members will recruit minors is increased, as well as the potential that minors will become witnesses or victims of gang violence. Thus, the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." (*Ward v. Rock Against Racism, supra,* 491 U.S. 781, 799.) This is all that is required to meet the "narrow tailoring" requirement. (*Ibid.*)

Further, the means chosen to advance the city's interest are not substantially broader than necessary. The city perceived that danger to minors existed in the risky environment of the CyberCafes. The daytime curfew is limited to CyberCafes with their risky environment, and to those times when the students are not under the presumed direct control and supervision of their parents. An exception is made where the parent or guardian is present to provide that supervision. Even if we could conceive a less speech-restrictive alternative to achieve the city's interest, the daytime curfew would not be invalidated. "Narrow tailoring" does not require the city to select the least restrictive alternative. (*Ward v. Rock Against Racism, supra,* 491 U.S. 781, 799–800.)

Finally, plaintiffs presented no evidence to establish the lack of "open ample alternative channels for communication." (*Clark v. Community for Creative Non-violence, supra,* 468 U.S. 288, 293.) It is common knowledge that alternative channels for communication over the Internet are abundant. Many have Internet access at home. Schools (where the minors should be in any event) commonly provide Internet access, as do public libraries. And, of course, the CyberCafes themselves are open to minors, even without parental supervision, for seven hours each day.

■ In finding the daytime curfew constitutionally invalid, the court appeared to reweigh the evidence to determine whether the need for regulation was supported factually. The court stated it found "the restriction on the presence of minors during public school hours bears no basis to the declared legislative intent of public safety. . . . No 'cyber cafe' crimes have been reported to the police during school hours." In doing so, the court engaged in impermissible legislative factfinding. " 'It is not the judiciary's function . . . to reweigh the "legislative facts" underlying a legislative enactment.' [Citation.] The scope of judicial review must be cognizant that the factual determinations necessary to the performance of the legislative function are of a peculiarly legislative character." (*Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 510–511 [120 Cal.Rptr.2d 197].) " '[T]he courts will not . . . engage in a trial at which the court, as trier of fact, determines the factual basis upon which the Legislature may act.' [Citation.] 'In other words, in enacting legislation the Legislature

has already, in the exercise of the legislative power, determined the facts necessary to support the legislation. The courts cannot revisit the issue as a question of fact, but must defer to the Legislature's determination unless it is palpably arbitrary. . . . Consequently, we must uphold the challenged legislation so long as the Legislature could rationally have determined a set of facts that support it.' " (*Id.* at p. 511.) Here, the city council could rationally have determined from the facts before it that the daytime curfew was a needed prophylactic measure to deter minors from being recruited or victimized by gangs when they should, under law, be in school. So long as the daytime curfew passes scrutiny under the First Amendment, it is not for the courts to reweigh the facts considered by the city council when it determined the ordinance was needed.[10]

■ Accordingly, on the evidence presented to the court, the daytime curfew passes constitutional muster. The plaintiffs failed to demonstrate a likelihood of prevailing on the merits. We conclude the daytime curfew is a content-neutral, narrowly tailored restriction that advances a significant governmental interest, leaving open ample alternative means of communication, and that the restriction does not restrict more speech than is necessary to advance the city's legitimate interest. The court abused its discretion when it preliminarily enjoined enforcement of the daytime curfew.

---

[10] The dissenting opinion takes an unduly narrow view of the permissible scope of the police power, and, in doing so, mischaracterizes our discussion. The dissent asserts the trial judge was right in finding "no evidence that any of the crimes took place during school hours," as if this somehow prevents the city from acting prophylactically to reduce the *risk* of minors being recruited or victimized by gangs. The dissent also mischaracterizes our reasoning as depending on an assumption that "kids who play hooky are more likely to be gang members than kids who don't." We do not say this, nor do we believe it. We do conclude, however, that the evidence before the city council was justification for it to conclude that the *risk* of gang recruitment or victimization is reduced if minors are prohibited at these locations when they should be at school.

The dissent then warns Disneyland, Knott's Berry Farm and other amusement parks that they "had better look out"—they might face a daytime curfew. We find no need to address the legitimacy of a daytime curfew imposed under other circumstances to address an unidentified problem at hypothetical locations. But as noted in footnote 8, *ante*, at least one court has upheld a citywide daytime curfew against a challenge based on state preemption (an issue not briefed in the instant case). (*Harrahill v. City of Monrovia, supra,* 104 Cal.App.4th 761.) And, in the abstract, we can't help but wonder what's so wrong about requiring school-age children to be in school during school days, no matter what the rationale. Why should any business "better look out" because kids are in school as required by the state's Compulsory Education Law. If appropriate, we are not unwilling to say so, as charged by the dissent. We are unwilling, however, to base our opinion on a justification for the ordinance not advanced by the city and not briefed by the parties.

## 4. *The Employee and Security Guard Requirements*

Ordinance No. 2591 added section 8.82.020, subdivision (3) to the Garden Grove Municipal Code, which established staffing requirements for a CyberCafe. Subdivision (3)(a) requires a CyberCafe to have "a minimum of one employee over the age of 18 on the premises during all hours of operation." For those CyberCafes having more than 30 computers on the premises, subdivision 3(a) requires an additional employee over the age of 18 years, except during the school hours of 8:00 a.m. to 3:00 p.m. Subdivision (3)(b) also requires the presence of a licensed uniformed security guard on the premises on Friday and Saturday nights between 8:00 p.m. to 2:00 a.m. The security guard can be counted as the additional employee for CyberCafes having more than 30 computers, but the owner of the establishment is prohibited from acting as the required security guard.

■ The impact on First Amendment activities of these staffing and security guard requirements is tenuous at best. Some would say there is no impact at all. But the ordinance does somewhat restrict the *manner* in which First Amendment activities may be conducted. Thus, communication over the Internet in a CyberCafe is prohibited unless conducted on premises having the required number of employees and, during specified hours, a security guard. We review these requirements to determine whether they are content-neutral, narrowly tailored *manner* restrictions, which leave open alternative channels for communications.

As found by the trial court, the staffing requirements make no reference to the content of any communication and are thus content neutral. And, as with the daytime curfew, ample alternative channels for communication are available. The remaining question is whether the staffing requirements are narrowly tailored to advance the city's substantial interest in public safety.

Chief Polisar's report to the City Council pointed to the potential for gang violence at CyberCafes because nonterritorial gangs had chosen these locations as the "business type of choice" at which to congregate. It cannot seriously be suggested that the presence of a responsible adult on the premises does not promote the city's interest in public safety and deterring gang violence. It does. Absent this regulation, CyberCafe owners would be free to staff their businesses with minors, an option most would agree is a less effective means of advancing the city's interest in public safety.

The city also concluded that the presence of two adults at CyberCafes having more than 30 computers is reasonably necessary for effective supervision, and that the presence of security guards during limited hours on Friday and Saturday nights would advance its interest in public safety. Thus, staffing

requirements are increased where the potential exists for a greater number of customers and during hours expected to have the greatest demand for the services of the CyberCafe. Absent the requirements of an extra employee at larger establishments and a security guard during high volume hours, the city's interest in public safety and deterring gang violence would be less effectively served. Further, the staffing requirements are not substantially broader than necessary. The city is not required to select the least restrictive alternative means for advancing its legitimate interest. (*Ward v. Rock Against Racism, supra,* 491 U.S. 781, 799–800.) "Where ordinances are concerned, it is not the business of the court to write the statute." (*City of San Jose v. Superior Court* (1995) 32 Cal.App.4th 330, 338 [38 Cal.Rptr.2d 205].)

■ Given the well-demonstrated criminal activity observed at CyberCafes, and their tendency to attract gang members, the court should not have second-guessed the city council's judgment and discretion. The staffing requirements are content neutral and are narrowly tailored to serve a significant governmental interest. Ample alternative means of communication remain open, and the requirements are not substantially broader than necessary. Accordingly, the court abused its discretion by enjoining enforcement of the employee and security guard requirements.

### 5. *The Video Surveillance Requirement*

The final challenged provision of ordinance No. 2591 is the addition of section 8.82.020, subdivision (8) to the Garden Grove Municipal Code, which requires CyberCafes to install a video surveillance system. The video system must be "capable of delineating on playback . . . the activity and physical features of persons or areas within the premises," and must "cover all entrances and exit points and all interior spaces, excepting bathroom and private office areas." "The system shall be subject to inspection by the City during business hours" and "[t]he videotape shall be maintained for a minimum period of 72 hours."

First, we note what the appeal on this issue is *not* about. Plaintiffs argue, "Garden Grove has decided that the plaintiffs must collect video records of all its patrons and make those images available to the government for any purpose whatsoever." But reasonably interpreted, that is *not* what the ordinance requires. "The system shall be subject to inspection" and the "videotape shall be maintained for a minimum period of 72 hours." The ordinance does not require the owner to allow inspection of the *tape* upon demand. For enforcement purposes, the city can assure itself the video surveillance *system* is operational. That is all the ordinance requires.

At the hearing on the preliminary injunction, counsel for the city agreed with this interpretation, and acknowledged the city could not take possession

of the video tape without legal process such as a search warrant. Upon hearing this reasonable interpretation of the ordinance by counsel for the city, plaintiffs' counsel said, "[I]f that's the city's understanding . . . then that issue can be resolved." The court reiterated the interpretation, and inquired whether the stipulation to that interpretation would suffice. Plaintiffs' counsel stated, "Yes, if that's the stipulation, that's fine. I can handle that. If that's what the city is saying, that we are not required, absent legal process, to turn a tape over to the city under the terms of this ordinance." Counsel for the city stipulated to this interpretation on the record, and the court did not further address the issue. The issue having been withdrawn from consideration by the trial court, it did not form any part of the basis for issuance of the injunction.

Plaintiffs offer no argument why the commonsense interpretation acknowledged before the court below should now be ignored, and an unreasonable interpretation substituted as a strawman in support of the injunction. While the normal rule of appellate practice requires an order to be affirmed if it is correct on any ground, (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 110 [115 Cal.Rptr.2d 285]), we cannot affirm an order based on an erroneous interpretation of the ordinance before us. Upon our de novo review of the video surveillance portion of the ordinance (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]), relying on its plain meaning (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 376 [20 Cal.Rptr.2d 330, 853 P.2d 496] ["The Legislature's intent is best deciphered by giving words their plain meanings"]), and remembering that even where two interpretations are possible the court will choose that interpretation rendering the ordinance constitutional (*Shealor v. City of Lodi* (1944) 23 Cal.2d 647, 653 [145 P.2d 574]), we conclude the interpretation acknowledged by all parties in the court below is correct. While the ordinance permits the city to inspect the video system to ensure it is operational, the ordinance does not subject the videotape to inspection by the city on demand.

■ Turning to what the video surveillance portion of the ordinance *does* say, we are not persuaded the video surveillance system affects First Amendment activity any more than does the presence of an adult employee and/or security guard.[11] The ordinance does not require video surveillance of e-mail or images from the Internet appearing on the customer's computer screens. The

---

[11] In this connection, we reject the dissenting opinion's unsupported, stereotypical, and pejorative characterization of security guards as "usually some guy standing around looking bored." If our dissenting colleague believes (without any supporting evidence) that all security guards do not observe, how would he distinguish between the observations made by a video camera and the observations made by other employees, customers, or, for that matter, police officers who wander in. True, the camera records. But we fail to understand how the camera's *invasion* of privacy is any greater. If an employee had a 72-hour photographic memory, would we make him unemployable because his presence would invade the privacy of the customers?

ordinance requires only that the system be capable of showing "the activity and physical features of persons or areas within the premises."[12] This is no more than can be observed by employees, security guards, or indeed, other customers. That the video system has a 72-hour memory that may be better than the short-term memory of the average security guard, customer, or employee is not a distinction of constitutional significance on First Amendment grounds. For the reasons discussed, *ante,* in connection with the employee and security guard requirements, the video surveillance requirement is a content-neutral *manner* restriction, narrowly tailored to advance the city's legitimate interest in public safety and deterrence of gang violence. Perhaps for this reason plaintiffs turn to article I, section 1 of the California Constitution, and assert that video surveillance invades the privacy of their customers.

"[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy. [¶] Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. [Citations.] Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39–40 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

Plaintiffs do not explain why persons in a public retail establishment have a protected privacy interest in either their activity on the premises or their physical features, why any reasonable expectation of privacy would attach in such circumstances, why the asserted invasion can be considered serious, and why, in any event, if the privacy interest both exists and is invaded, the governmental interest sought to be advanced does not make the minimal intrusion constitutionally permissible.[13] Instead, plaintiffs make only general

---

[12] So much for the dissenting opinion's repeated (and inaccurate) references to a " 'Big Brother' style *telescreen* to look over one's shoulder while accessing the Internet." (Dis. opn., *post,* at p. 451.) It just isn't so. The ordinance doesn't require it. And if the CyberCafe owners install their video cameras so as to be more intrusive than required by the ordinance, they have only themselves to blame if their business diminishes.

[13] The dissenting opinion also fails to answer these questions, other than to characterize the ordinance as saying something it does not say, and by making comparisons to restrictions imposed by totalitarian governments. The licensing of typewriters in Albania, Bulgaria, and Cuba would surely not survive scrutiny under our Constitution, since it quite plainly is a prior restraint. That is precisely why we upheld the injunction against the CUP requirement of the

references to cases involving the right of privacy. A brief must contain reasoned argument and legal authority to support its contentions, or the court may treat the argument as waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

 Even if the argument were not waived, we do not find any legally protected privacy right of the customers in their activity on the premises or their physical features. *Hill v. National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th 1, 35, identified two classes of legally recognized privacy interests: "(1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." The video surveillance system required by the ordinance does not intrude on either type of interest. A person's physical features are not "confidential," nor are activities on the premises of a public retail establishment. No legally recognized informational privacy right can attach to either. Nor can it reasonably be understood that the observation of persons using a computer in a CyberCafe involves intrusion either on the making of an intimate personal decision or on the conduct of a personal activity.[14] Plaintiffs do not explain why observation by a video camera intrudes on privacy any more than observation by employees or other patrons.

Finally, even if observation by a video surveillance system in these circumstances did somehow intrude on a legally recognized privacy right, a reasonable expectation of privacy is wholly lacking. "A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms." (*Hill v. National Collegiate Athletic*

---

ordinance. And the "layered firewalls conservative elements of Vietnam's government have placed on Internet access" would likewise fail as a content-based restriction. (Dis. opn., *post*, at p. 454.) Similarly the reports of Communist China and Vietnam curbing the freedom of ideas by banning access to certain sites, and by requiring the policing of the Web sites visited and the persons to whom e-mails are sent would fail constitutional scrutiny in our country. The dissenting opinion also reports that Malaysia tried to force customers of CyberCafes to register their names and identity card numbers, but backed down in response to complaints. The ordinance at issue here, of course, does nothing of the sort. But the topper to all of this argument is the dissent's charge that the majority is "willing to countenance infringements on the rights of cybercafe users which even the government of Malaysia is too ashamed to enforce!" (*Ibid.*) Wow! We will not respond in kind. We prefer to debate the issues on the merits.

[14] We note in passing our dissenting colleague's footnote in which he announces, "Even in the most mundane retail establishment no one would think of putting a video camera in the public restrooms." (Dis. opn., *post*, at p. 453, fn.2.) But in *Tily B., Inc. v. City of Newport Beach* (1998) 69 Cal.App.4th 1, 24 [81 Cal.Rptr.2d 6], a case which analyzed, inter alia, an ordinance requiring an attendant to be stationed in a public restroom, our dissenting colleague *concurred* in the opinion which held that "[w]hatever individual sensibilities, there is no constitutional right to privacy in the restrooms of a place of public accommodation . . . ." In any case, the ordinance in the instant case does not require video surveillance of restrooms.

*Assn., supra,* 7 Cal.4th 1, 37.) With the near ubiquitous use of video surveillance in retail establishments, at automated bank teller machines, and at road intersections, it is difficult to imagine, certainly at the preliminary injunction stage, that the customer's expectation of privacy is reasonable under the circumstances. Further, *no evidence* was presented in the trial court in support of the privacy claim. Nor could such evidence easily be presented. Each of the declarations submitted by CyberCafe owners in support of the temporary restraining order and preliminary injunction disclosed they already had installed video surveillance systems on their own. Although the issue of whether a legally recognized privacy interest is present is a question of law, the issues of whether a reasonable expectation of privacy is present and whether the conduct in question is a serious invasion of privacy are mixed questions of law and fact. (*Id.* at p. 40.) Without any evidence on these questions, plaintiffs could not establish a likelihood of success on the merits, either on First Amendment or on privacy grounds, and the preliminary injunction should have been denied. Accordingly, the court abused its discretion when it preliminarily enjoined the video surveillance requirements of the ordinance.[15]

---

[15] We respond briefly to the dissenting opinion's discussion suggesting the ordinance must be subjected to strict scrutiny, and that even under a balancing test it does not pass constitutional muster. First, not even the plaintiffs suggest strict scrutiny as the appropriate test. And for good reason. The dissenting opinion's view on this issue cites no law in support of its analysis. Instead it offers comparisons to totalitarian regimes imposing prior restraints and content-based restrictions on speech, neither of which is implicated by the video surveillance requirements. We have fully recognized these types of restrictions would cross a constitutional boundary and for that reason have agreed with the trial court that the CUP requirements may not be enforced. But, mixing the privacy analysis with the free speech analysis, the dissenting opinion quotes an incomplete passage from *Hill v. National Collegiate Athletic Assn, supra,* 7 Cal.4th 1, 34. Let us complete the passage. "The particular context, i.e., the specific kind of privacy interest involved and the nature and seriousness of the invasion and any countervailing interests, remains the critical factor in the analysis. Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest. If, in contrast the privacy interest is less central, or in bona fide dispute, general balancing tests are employed." (*Ibid.*)

The dissenting opinion's failure to discuss the *nature* of the privacy interest supposedly invaded by the ordinance renders suspect its conclusion about the strict scrutiny standard. Whatever that interest is, it surely is not "fundamental to personal autonomy." People don't do things "fundamental to personal autonomy" in a public retail establishment. The dissent throws the reader off track by confusing the privacy issue with the free speech issue, asserting that CyberCafes "are the poor man's printing press and private library." As we have pointed out in the majority opinion, reasonable expectations of privacy in the setting of a CyberCafe are simply not present.

The dissenting opinion urges us to consider that only three CyberCafes have experienced gang-related violence and only five CyberCafes have experienced criminal activity of any type. Thus, the dissent believes that criminal activity at 22 percent of the establishments is not sufficient to justify the video surveillance requirement. What if the problems had occurred at 30 percent, or 40 percent, or 50 percent of the establishments? Is the court to decide where to

## DISPOSITION

The court's order preliminarily enjoining the enforcement of the CUP requirement contained in section 5 of Ordinance 2573 is affirmed. The court's order preliminarily enjoining the enforcement of: (1) that portion of section 8.82.020, subdivision (1) of the Garden Grove Municipal Code, restricting access by minors between 8:00 a.m. and 3:00 p.m.; (2) section 8.82.020, subdivision (3) of the Garden Grove Municipal Code, regulating the number of employees and requiring security guards during certain hours; and (3) section 8.82.020, subdivision (8) of the Garden Grove Municipal Code, requiring video surveillance systems, are reversed. In the interests of justice, the parties shall bear their own costs on appeal.

Bedsworth, J., concurred.

**SILLS, P. J.,** Concurring and dissenting.—I respectfully dissent to the most important part of the majority opinion, in which it holds that Garden Grove may *require* video surveillance in *every* cybercafe in the city, regardless of whether that cybercafe has experienced any gang-related violence, or, indeed, even any problems of the most minor nature.

This is an appeal by the city from the *grant* of a preliminary injunction by the trial court, which means that where there is a conflict or inference in the evidence, it must be drawn in favor of the trial court's decision. Yet there was substantial evidence to support the trial court's grant of a preliminary injunction against the city, particularly the intrusive video surveillance requirement. The majority only grudgingly acknowledges (and only in response to this dissent) that under the evidence submitted by the city, only three of 22 cybercafes have experienced "gang-related" violence, only two more have experienced serious crime of any kind (one of the two was a drug deal), nor do they tell the reader that the city's own evidence concerning cybercafes in other cities showed *no* gang-related crimes at cybercafes outside of Garden

draw this line? Or, as we suggest, is the court to "accord[] the kind of 'administrative leeway' necessary to accomplish [legally valid purposes central to the city's function] with 'increased efficiency.' " (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th 1, 50, fn. 16.) As noted earlier, the fundamental flaw in the dissent's analysis is the *weighing* of legislative facts. The dissent wants to balance the facts supporting the adoption of the ordinance against facts not supporting the ordinance. It makes no attempt, as it should, to balance the governmental interest sought to be advanced against the privacy interest supposedly invaded. Without identifying the privacy interest at stake, whether an informational interest or an autonomy interest, the balance can not be struck.

With respect to First Amendment speech and press concerns, all parties, and the majority opinion, apply an intermediate standard by which the regulation is reviewed under well-established law to determine whether it is an appropriate time, place, and manner restriction on speech. While we may disagree whether the ordinance is a valid time, place, or manner restriction, this is the proper analysis by which the free speech issues are resolved.

Grove. That leaves 17 cybercafes which have experienced no serious problems, a fact which should be enough to require this court to affirm the trial court's injunction, not overturn it.

It is the video surveillance issue, though, that is the most problematic, and the one with the most obvious privacy implications. Do my colleagues not realize the—there is no other word for it—Orwellian implications of their ruling today? They approve an ordinance which *literally* forces a "Big Brother" style *telescreen* to look over one's shoulder while accessing the Internet.[1]

Sorry, I can't go along with this emasculation of our state Constitutional right to privacy and with the concomitant infringement on the rights of freedom of speech and press.

As I show below, cybercafes deserve the protection of a strict scrutiny standard when regulations implicating privacy and freedom of speech are imposed upon them. But even if a strict scrutiny standard is not appropriate, a *balancing* standard certainly is. The majority have not even attempted a *balancing* of the respective interests. Rather, the essence of their opinion is nothing less than almost slavish deference to an unsupported and illogical conclusion of the city's police chief and city council.

Granted, the majority do pay lip service to "narrow tailoring." (See *Ward v. Rock Against Racism* (1989) 491 U.S. 781, 799 [105 L.Ed.2d 661, 109 S.Ct. 2746].) But they never explain why an ordinance which requires a video camera looking over your shoulder as you access the Internet is "narrow tailoring" under *Ward*.

It clearly isn't. There are any number of substantial means by which the city's interest in protecting against gang violence could be realized without video surveillance. Police patrols could be increased. Owners could be supplied with a list of gang-members who could be refused service. Security guards could be posted at those cybercafes which have already experienced gang-related violence. Yet the majority steadfastly refuse to confront such possibilities, all in the name of deference to "legislative facts" found by the city council. Whatever that is, it isn't trying to minimize any burden on privacy or speech to what is reasonably necessary.

The majority also commit the logical error of generalization. Rather than confront the fact that only a small minority of cybercafe venues have

---

[1] Inaccurate metaphor? (See *State v. Costin* (1998) 168 Vt. 175, 183 [720 A.2d 866, 871] (dis. opn. of Johnson, J.).) Readers who contemplate the governmentally required installation of video cameras behind them while they operate a computer can decide for themselves whether today's decision doesn't take us much closer than we already are to a "Big Brother" society.

experienced problems, they (illogically) leap to the idea that there is a "well-demonstrated" connection between cybercafes and gang-related violence. Sigh. They might as well say there is a "well-demonstrated" connection between homes and residential burglary, or, in Garden Grove at least, between Vietnamese restaurants and gang-related violence. To spell it out: The majority make the logical error of ascribing to all members of a class characteristics which apply to only a minority of members.

And that is not all. With today's opinion, the majority additionally take a serious but unexamined step to approve an alarming trend in land use regulation, which is to fob off onto private citizens the governmental duty to provide police protection. The best one can say on this issue is that, by not seriously examining it, the majority leave it for another day (and hopefully better briefing).

Finally, the majority advance a weak and unpersuasive rationale to uphold the daytime curfew. There *is* no evidence that the absence of a daytime curfew is in any way a threat to minors, or that a curfew will prevent gang-related violence. Moreover, the majority is not willing to say, simply, that the curfew could be justified because the kids ought to be in school. But think about that rationale a little and you soon realize that a city could impose a daytime curfew on minors at Magic Mountain (think of the gang problems it had a few years back), Disneyland, Knott's Berry Farm, Universal Studios or even the daytime Angels' baseball games. And since neither I nor the majority are willing to go that far, I am forced to conclude there is no basis to overturn the trial court on that issue as well.

## I. *The Appropriate Standard Is Strict Scrutiny*

The right to privacy is guaranteed by the state Constitution of California. (Cal. Const., art. 1, § 1.) As explained in *Loder v. City of Glendale* (1997) 14 Cal.4th 846, 891–892 [59 Cal.Rptr.2d 696, 927 P.2d 1200] and *Hill v. National Collegiate Athletic Association* (1994) 7 Cal.4th 1, 34 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*), most of the time invasions on privacy are analyzed using a balancing test. Sometimes, however, such restrictions must be analyzed using the more rigorous strict scrutiny compelling state interest test. As *Hill* put it, "The particular context, i.e., the specific kind of privacy interest involved and the nature and seriousness of the invasion and any countervailing interests, remains the critical factor" as to whether compelling state interest or balancing applies. (*Hill, supra,* 7 Cal.4th at p. 34.)

Government action "impacting freedom of expression and association" receives the compelling state interest standard. (*Hill, supra,* 7 Cal.4th at pp. 34, 50; see also *White v. Davis* (1975) 13 Cal.3d 757, 776 [120 Cal.Rptr.

94, 533 P.2d 222] [compelling state interest required for government surveillance of classroom discussion]; *Long Beach Employees Association v. City of Long Beach* (1986) 41 Cal.3d 937, 948 [227 Cal.Rptr. 90, 719 P.2d 660] [compelling state interest required to justify polygraph examination of city employees]; *Committee to Defend Reproductive Rights v. Myers* (1981) 29 Cal.3d 252, 273–282 [172 Cal.Rptr. 866, 625 P.2d 779] [compelling state interest required to overcome indigent woman's privacy interest in reproductive rights].)

Cybercafes are not just your ordinary "retail establishment."[2] Cybercafes allow people who cannot afford computers (or, often, who cannot afford very high speed Internet connections) the freedom of the *press*. They can post messages to the whole world, and, in theory (if they get enough "hits") can reach more people than read the hard copy of the New York Times every morning. It is thus telling that in defamation law, posting a statement to the Internet is considered "publication"—in a very real sense a Web site *is* publication every bit as much as the large presses of a major newspaper. As Judge Kozinski has noted about the freedom of the press inherent in access to the Internet: "For instance, look at Matt Drudge. He sits in his little apartment with a computer and trawls the Internet and overnight becomes a reputable news source—at least a to-be-feared news source." (Calvert & Richards, *Defending the First in the Ninth: Judge Alex Kozinski and the Freedoms of Speech and Press* (2003) 23 Loyola L.A. Ent. L. Rev. 259, 276.) With the Internet, the average computer blogger has, in effect, his or her own printing press to reach the world. (Cf. *ibid.* [Judge Kozinski noting, given the rise of blogging, that "I think the division between press and ordinary speech has all but disappeared"].)

Cybercafes thus allow people who cannot afford computers (or the high speed connections) to access the global bulletin board of the Internet, i.e., the ability to *receive* what others have posted. Logging on is an exercise of free speech.

Consider that totalitarian governments have always cracked down on unrestricted access to the *means* of communication. When the Communists were in control of countries such as Albania and Bulgaria, each *typewriter*

---

[2] It will not do, as the majority reason, to say that this case has nothing to do with privacy because the video cameras will not necessarily record screen images and no one has any privacy interest whilst visiting a retail establishment. Even in the most mundane retail establishment no one would think of putting a video camera in the public restrooms. To the degree that *Tily B., Inc. v. City of Newport Beach* (1998) 69 Cal.App.4th 1, 24 [81 Cal.Rptr.2d 6] is taken out of context and read for the overbroad, blanket, and when you think about it, frightening proposition that there is no privacy right *at all* in a public restroom, even in the toilet stalls, I disassociate myself from the opinion. And I doubt that the other member of the *Tily B.* panel, the late Justice Thomas Crosby, would go along with the proposition either.

was licensed. Today typewriters are still licensed in Communist Cuba. (See Calvert & Richards, *Defending the First in the Ninth: Judge Alex Kozinski and the Freedoms of Speech and Press, supra,* 23 Loyola L.A. Ent. L. Rev. at p. 271 [quoting Judge Kozinski, "In Cuba, the last I heard, they were still registering typewriters"].)

Consider that in Communist Vietnam, the hunger for the free expression of ideas has led to a "cybercafe phenomenon." As the American ambassador to Vietnam has noted: "Thousands of young Vietnamese are accessing the internet at scores of cybercafes across the country. They are obtaining and exchanging information, and many are doing so by finding innovative ways to circumvent the layered firewalls conservative elements of Vietnam's government have placed on internet access. This story reflects the thirst of Vietnam's young people for a tangible connection to the world beyond their borders. . . ." (Pearson, *The U.S./Vietnam Bilateral Trade Agreement: Another Step in the Right Direction* (2002) 10 U. Miami Bus. L. Rev. 431, 448.)

And consider that the governments of both Communist China and Vietnam have recently cracked down on cybercafes in an effort to curb the freedom of ideas that they promote—an effort that has entailed learning the identity of cybercafe users. (See Hughes, *The Internet and the Persistence of Law* (2003) 44 Boston C. L. Rev. 359, 369 ["the 2002 Chinese crackdown on cybercafes has included the installation of software that records attempts by cafe users to access banned sites"]; Calvert & Richards, *Defending the First in the Ninth: Judge Alex Kozinski and the Freedoms of Speech and Press, supra,* 23 Loyola L.A. Ent. L. Rev. at p. 271, fn. 64 [noting that "There is great concern, in fact, in China, as well as Vietnam, about the influence of the Internet on their political systems. According to at least one report, those countries 'are cracking down on the proliferation of "cybercafes." Recent regulations in these countries require cafe owners to police what web sites their customers are visiting and who they are e-mailing—or face arrest and incarceration' "].)

Given the constitutional ramifications of the very nature of cybercafes, I will go so far as to say that there is an expectation of privacy even as to one's *identity* when using a cybercafe. In that regard, it is highly ironic that in Malaysia, the government recently tried to force all customers of cybercafes to register their names and identity card numbers. And then it backed down in response to complaints from foreign investors. (See Hang, *Special Feature: The Financial Meltdown in Asia: Crisis and Response* (1999) 3 Singapore J. Intl. & Comp. L. 1, 17, fn. 67.) Apparently my colleagues are willing to countenance infringements on the rights of cybercafe users which even the government of Malaysia is too ashamed to enforce!

Assuming that I am correct that infringements on the privacy of cybercafe customers require strict scrutiny, it is clear that the video surveillance condition cannot stand. But what if the proper standard is balancing?

## II. *The Majority Opinion Errs Even Under a Balancing Test*

At the very least, as *Loder* and *Hill* teach us, infringements on privacy must pass muster under a balancing test. (See also *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656–658 [125 Cal.Rptr. 553, 542 P.2d 977] [balancing test used to weigh privacy of bank customers]; *City of Santa Barbara v. Adamson* (1980) 27 Cal.3d 123, 131–134 [164 Cal.Rptr. 539, 610 P.2d 436] [privacy interest in living with unrelated persons outweighed city zoning regulations].)

But balancing is not unqualified deference to city councils. A court cannot just turn over to the city the balancing under the guise that it does not want to "reweigh" the evidence. (See *Long Beach Employees Association v. City of Long Beach, supra,* 41 Cal.3d at pp. 943–949 [city's interest in preventing theft because money was missing did *not* justify a blanket requirement that all employees take a polygraph test].)

The majority opinion makes no serious attempt to *balance* the right of privacy with the city's interest in preventing gang violence. That would actually require looking at the facts and asking why only three of 22 cybercafes have experienced gang-related violence. It would also require asking—which the majority never do—why the governmental interests at stake here cannot be realized with much less intrusiveness than the blunderbuss approach taken by the city council.

At this point a little deconstruction of the majority opinion is necessary. Readers of the majority opinion will note that the rationale with regard to video surveillance of cybercafes is camouflaged. The majority doesn't address the video surveillance question directly.[3] Rather, the majority first avoids confronting the problem of video surveillance by erecting a straw figure and kicking it down. Some considerable space is devoted to refuting the idea that the city has required the video cameras to be pointed at the screens.

Well, thankfully, even this majority understands that *that* would be too much. But then the majority go on to approve of the requirement that there be video cameras at the cybercafes with the ipse dixit that video surveillance is "narrow tailoring." Note that they do not explain why at that point in the opinion. Rather, the majority merely refers the reader to what was previously said about security guards.

---

[3] Except in footnotes in response to this dissent.

But security and video cameras are hardly self-evidently analogous in a privacy context. A security guard is usually some guy standing around looking bored. A video camera is a permanent record of events, accessible to the police with a proper search warrant. Thus on page 447 of the majority opinion there is the declaration that the video surveillance requirement is "a content-neutral *manner* restriction, narrowly tailored to advance the city's legitimate interest in public safety and deterrence of gang violence"—with the only attempt to explain why being "[f]or the reasons discussed, *ante*, in connection with the employee and security guard requirements."

And what are those reasons discussed, "*ante*?" Well, that's not clear from pages 444–445 of the majority opinion, which deal with the security guard issue. Much of that discussion concerning security guards and adult employees is not applicable to video cameras. However, the best I can make of the "reasons discussed, *ante*" is a statement found on page 445 of the majority opinion made in specific reference to security guards: "Given the well-demonstrated criminal activity observed at CyberCafes, and their tendency to attract gang members, the court should not have second-guessed the city council's judgment and discretion."

I will address the error of logic in this revealing sentence in part III below. For the moment, though, it is enough to note the absolute absence of any attempt to *balance* the interest in privacy with the city's interest in preventing gang violence, nor specifically how the requirement of video surveillance in every cybercafe is not substantially broader than necessary to achieve that interest. Why not require video cameras at only those cybercafes which have already experienced gang-related violence? Why isn't a security guard by himself or herself enough to protect the city's interest? What could the owner do by way of refusing service to known gang members that would obviate the need for the intrusiveness of video cameras? None of these questions are remotely dealt with in the majority's opinion, whose premise is that courts dare not ask them, lest they "second-guess" a city council's decision.

The closest the majority comes to confronting the problem of privacy with regard to cybercafes is one statement on page 447 of the majority opinion: "Plaintiffs do not explain why persons in a public retail establishment have a protected privacy interest in either their activity on the premises or their physical features . . . ." I have done so above. Cybercafes are *not* just ordinary retail establishments—they are the poor man's printing press and private library.

III. *The Majority's Analysis In Regard to the Video*
*Surveillance Issue Allows for An Irrational,*
*Overinclusive Presumption*

The key sentence in the majority opinion is this one, first made in connection with a security guard but later incorporated by reference into the discussion regarding the video cameras: "Given the well-demonstrated criminal activity observed at CyberCafes, and their tendency to attract gang members, the court should not have second-guessed the city council's judgment and discretion." (Maj. opn., *ante*, at p. 445.)

The error here is the logical fallacy of generalization. Note the indiscriminate, generalized term "observed at Cybercafes." Not *some* cybercafes. Not what the record shows—three (or, at most, five) of 22 cybercafes. But "CyberCafes,"—a generalized generic category, sweeping over 17 problem-free sites, as well as the five which have had problems.

As I mentioned above, the majority opinion only grudgingly acknowledges one of the most interesting parts of the record, which is a survey of the problems which surrounding cities (many cities in Orange County and some in Los Angeles County)[4] have had with cybercafes. Guess what? *None* reported any gang violence. Oh, there were a few instances of loitering in Los Alamitos, Cypress and in Long Beach. In Monterey Park there were "Concerns, police related," but instances of gang violence are simply not to be found in that table. So the "gang" problem seems confined to Garden Grove. I will let some interested graduate student of social ecology at the University of California Irvine explain why, but the point is that the empirical evidence from other cities shows what is only intuitive anyway: There is nothing *inherently* attractive about cybercafes to "gangs." For whatever reason, the most one can say here is that the gangs of Garden Grove have an idiosyncratic penchant for *some* cybercafes. And yet on the basis of problems at a minority of venues—and possibly unpreventable problems at that—the majority rubber stamps the city's attempt to impose heavy security costs on all venues.

California law is inimical to such over-generalized thinking. To illustrate, let's take a case where there are no First Amendment or privacy concerns, and where the federal Constitution allows the states to regulate to their heart's content. The sale of alcoholic beverages.

In *Laube v. Stroh* (1992) 2 Cal.App.4th 364, 367–368 [3 Cal.Rptr.2d 779], the Department of Alcoholic Beverage Control wanted to yank the license of the upscale Pleasanton Hotel because undercover officers had managed to pull

---

[4] For some reason Irvine is not listed. For some reason Monterey Park is.

off a *concealed* sale of illegal drugs in its lounge. The theory was that the hotel had "permitted" the sale, by not taking every conceivable measure to prevent such sales, including, as the appellate court so brilliantly put it, "Orwellian schemes of customer surveillance inconsistent with contemporary societal values." (*Id.* at p. 371.) The Court of Appeal rejected that sort of mandatory intrusiveness, noting there had been no differentiation between places such as the Pleasanton Hotel and seedy bars where crime was indeed more of a threat.

It is the same here. The evidence only supports restrictions at three cybercafes for gang-related incidents, maybe two more for other kinds of serious crime, but none at all for the remaining 17 cybercafes in the city. The majority merely rubber stamp the overgeneralization of the police chief: A minority of cybercafes have had "well-demonstrated criminal activity" ergo very intrusive restrictions are justified on all cybercafes. And the exasperating part is that the majority make no attempt to show any organic, logical or even empirical relationship between the nature of the cybercafe business and what crime has occurred. It's as if they are saying, "don't ask us to think, if the police chief believes there ought to be blanket restrictions on all cybercafes, that's good enough for us."

### IV. The Majority Analysis With Regard To the Security Guard Issue Suffers from the Same Sin of Generalization

What I have just said as to overinclusive presumptions applies just as much to the burden of imposing private security guards on private businesses, even though security guards and adult employee requirements obviously do not implicate the same privacy (and perhaps free speech) concerns that are implicated by mandatory video surveillance. The evidence, at the most, supports the imposition of a security guard requirement on five of 22 cybercafes, and only then if you assume that being the owner of a business which has experienced crime can justify a direct government imposition of a security guard requirement. (Usually, when there have been repeated crimes at a business, the threat of a civil tort lawsuit is enough to prompt an owner to take extraordinary security measures.)

Here, there is nothing in the record to indicate that any of the owners of the cybercafes which have experienced violence did anything to encourage it. What was their wrongdoing? Calling the police if there were troublemakers frequenting their business?

Under the majority opinion innocent business owners can have private security requirements imposed upon them just because a member of the class

of businesses has experienced crime. But at this point I must go a little deeper, and suggest that the record is susceptible of a motive to punish cybercafes *qua* cybercafes.

Consider: Private residences are "notorious" and "well-documented" venues for home burglaries. And it is common knowledge in Orange County that in Garden Grove, Vietnamese restaurants have often been the scenes of gang violence. It would be very easy to say, in the language of the majority opinion, that there is "well-demonstrated criminal activity" which has been "observed" at the city's restaurants and residences. But the city has not (yet) required security guards for restaurants or new residential construction.

The obvious inference is that the city is picking on cybercafes. No city council would dare require private security guards for private residences or restaurants, even though—I repeat—there is just as much reason to impose such requirements if one sticks to the rationale of the majority opinion. And yet if any difference exists, ironically enough, it cuts in the direction of more freedom for cybercafes: *They* implicate freedoms of the speech and press, while eateries and residences do not.

## V. *The Majority Analysis With Regard To the Security Guard Issue Ignores the Problem of Delegation*

This case is an example of an alarming trend in municipal government whereby cash-strapped cities and counties have discovered that they can effectively shift the costs of police protection from the public to private parties. The delegation issue has, however, not been briefed. I would therefore note that the majority opinion cannot be read to endorse this trend. The issue remains open for exploration in a future case.

## VI. *The Majority Analysis With Regard To the Curfew Issue Is Not Supported by the Evidence*

The majority takes the trial judge to task for "impermissible fact-finding" when he concluded that there was no evidence the school-hours curfew bears any relationship to public safety. For what it is worth, on that narrow point the trial court was right. There *is* no evidence that any of the crimes took place during school hours. Moreover, the only inherently logical nexus (and one not even attempted by the majority) between being patronized by students playing hooky and gang violence is at best a weak one, i.e., that kids who play hooky are more likely to be gang members than kids who don't, but that is at best speculation given this record (the difference may be slight indeed).

Given this (lack of evidence), I think the trial court was right. If you believe otherwise, then Disneyland, Knott's Berry Farm and other amusement parks had better look out. The same paucity of evidence which the majority use today to justify the curfew could be used to impose one at any amusement park or business where a sizable part of the customer base are minors.

## VII. *Conclusion*

The majority opinion represents a sad day in the history of civil liberties. They see no infringement on privacy when a video camera is, literally, looking over your shoulder while you are surfing the Internet.

Constitutional freedoms are most fragile at the local level. If a bill were introduced in Congress to require video surveillance in cybercafes, you would hear about it in no uncertain terms on the op ed pages of most major newspapers. But because this case is confined to Garden Grove and most affluent people already have computer access to the Internet (though not, usually, high speech access), the majority reason, "what's the big deal?"

Here's the big deal. This is the way Constitutional rights are lost. Not in the thunder of a tyrant's edict, but in the soft judicial whispers of deference.